******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# AMMAR IDLIBI *v.* HARTFORD COURANT COMPANY
## (SC 20800)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Westbrook, Js.

*Syllabus*

The self-represented plaintiff, who had sought to recover damages from the defendant newspaper in connection with its publication of two articles that allegedly defamed the plaintiff, appealed from the judgment of the Appellate Court, which had affirmed the trial court's judgment. In granting the defendant's motion for summary judgment, the trial court had concluded, inter alia, that five allegedly defamatory statements in the articles were substantially true or were subject to the fair report privilege and, therefore, were protected speech under the first amendment to the United States constitution. On appeal to this court, the plaintiff claimed, inter alia, that the Appellate Court had improperly declined to consider his claim that the trial court should have permitted him to proceed on a sixth allegation, which was only vaguely alluded to in his pleadings, that a misleading stock photograph accompanying the two articles was itself independently defamatory. *Held*:

Regardless of whether the Appellate Court properly declined to review the plaintiff's claim regarding the stock photograph, the trial court did not err in declining to treat the plaintiff's passing references to that photograph as an independent allegation of defamation in granting the defendant's motion for summary judgment.

The plaintiff had contended only that the stock photograph amplified his other defamation claims and that it was evidence of actual malice, and he did not allege in his complaint that the photograph was independently defamatory or otherwise identify the photograph as defamatory before the trial court, and, under the circumstances of this case, the plaintiff's self-represented status did not relieve him of the obligation to sufficiently articulate a claim that the stock photograph was independently defamatory.

Moreover, if the trial court had sua sponte assisted the plaintiff in articulating and pleading an additional claim that was not apparent on the face of his complaint, and of which the defendant was unaware, the court would have risked creating an appearance of partiality and would have interefered with the defendant's rights, and, even if the plaintiff had been permited to proceed, he would have faced difficulties in prevailing on that additional claim.

For the fair report privilege defense to defamation to apply to an allegedly defamatory report concerning an official proceeding, a defendant need only establish that it has provided a fair and substantially accurate account of

the proceeding, and demonstrating that the defendant acted with malice in fact does not defeat the privilege.

(*Two justices dissenting in one opinion*)

Argued December 19, 2023—officially released August 27, 2024*

*Procedural History*

Action to recover damages for, inter alia, defamation, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the court, *Farley, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to the Appellate Court, *Cradle, Suarez* and *Seeley, Js.*, which affirmed the trial court's judgment, and the plaintiff, on the granting of certification, appealed to this court. *Affirmed.*

*Ammar A. Idlibi*, self-represented, the appellant (plaintiff).

*William S. Fish, Jr.*, with whom was *Alexa T. Millinger*, for the appellee (defendant).

*Opinion*

McDONALD, J. The self-represented plaintiff, Ammar Idlibi, a pediatric dentist, appeals from the judgment of the Appellate Court affirming the judgment of the trial court, which rendered summary judgment in favor of the defendant, Hartford Courant Company, on his defamation claims. The plaintiff's complaint centers around two articles published by the defendant that allegedly exaggerated the scope and seriousness of disciplinary proceedings conducted by the Department of Public Health (department) and the Connecticut State Dental Commission that resulted in a reprimand, fines, and probation of the plaintiff's license to practice as a dentist. The courts below concluded that the five allegedly defamatory statements contained in the articles either were

---

* August 27, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

substantially true or were subject to the fair report privilege and, therefore, were protected speech under the first amendment to the United States constitution. In this certified appeal, the plaintiff's primary claim is that he should have been permitted to proceed to trial on a sixth allegation, one only vaguely alluded to in his pleadings, that a stock (or file) photograph accompanying the defendant's articles also was defamatory. Although this case raises important questions about the extent to which the judiciary must accommodate the inexperience of self-represented litigants, and potentially implicates some constitutional questions of first impression that the parties have not fully briefed, we ultimately conclude that this sixth claim is not properly in the case and, therefore, affirm the judgment of the Appellate Court.

I

The relevant facts and procedural history are set forth in the decision of the Appellate Court. See *Idlibi* v. *Hartford Courant Co.*, 216 Conn. App. 851, 854–60, 287 A.3d 177 (2022). They may be summarized as follows.

Between 2013 and 2018, the plaintiff was the subject of two unrelated sets of disciplinary proceedings, both of which resulted in findings of professional misconduct. The first arose from allegations that, between 2010 and 2012, he had prescribed Valium, Xanax, codeine, and other controlled substances to himself and his family members outside the scope of dentistry. Those proceedings terminated when the plaintiff signed a consent order, admitting to certain of the allegations and agreeing to pay a $2000 civil penalty.

The second set of proceedings arose from an April 26, 2016 dental procedure in which the plaintiff, filling in for an associate, put a three year old patient under general anesthesia and placed crowns on eight of her teeth, even though her mother had given informed con-

sent for the placement of only one crown. At the time, the defendant was investigating a form of Medicaid fraud in which, to circumvent Medicaid's prior approval requirements, pediatric dentists would take advantage of a limited exception that allows them to perform unapproved procedures if the need therefor is discovered while a patient is under general anesthesia.

The patient's mother complained to the department, which conducted an investigation and ultimately brought charges against the plaintiff before the dental commission. A panel of commission members conducted hearings on the matter and drafted a proposed decision that was to be the subject of a hearing before the full commission on September 5, 2018. The proposed decision concluded that the plaintiff had, among other things, failed to obtain adequate informed consent for the procedure, failed to adequately chart the findings that led him to conclude that the crowns were necessary, failed to first attempt treatment by less invasive means, and placed one or more crowns without adequately documented justification.[1]

One week before the scheduled hearing, Matthew Ormseth, a reporter for the defendant, conducted an interview with the plaintiff. The stated purpose of the interview was to discuss the allegations surrounding the April 26, 2016 dental procedure, as well as another department investigation into allegations that Smile by

---

[1] Following the September 5, 2018, hearing, the full dental commission found the plaintiff's testimony not to be credible and credited the testimony of the department expert that the plaintiff should not have crowned several of the patient's teeth because the enamel was completely healthy and the X ray did not show any decay. The dental commission agreed with most of the proposed draft findings and ordered various sanctions against the plaintiff, including a $10,000 civil penalty, placement of a reprimand on his license to practice as a dentist, and a three year probationary period, during which his license would be subject to conditions. A series of appeals and remands ensued, which ultimately resulted in changes to some of the commission's findings and conclusions but imposition of the same sanctions for the plaintiff's professional misconduct.

Design, a dental practice co-owned by the plaintiff, had engaged in similar misconduct.[2] On September 5, 2018, the defendant published two articles authored by Ormseth, one the morning before the dental commission hearing and one following the hearing. The articles, although including substantially accurate accounts of the commission proceedings, contained five allegedly false or misleading statements regarding the plaintiff: (1) a headline stating, "State Probes Terryville Dentist for Excessive Work on *Children's* Teeth," when, in fact, only one child's set of teeth was implicated; (2) a statement that the state had been *investigating* the plaintiff for two years, when, in fact, the investigation and related proceedings together had spanned two years; (3) a statement that his work had been found to be *medically* unsound, when, in fact, it was *dentally* unsound; (4) a statement about the plaintiff's first set of disciplinary proceedings that allegedly created the false impression that he abused narcotic drugs; and (5) a statement that, in the past fiscal year in Connecticut, only thirty-seven steel crowns had been placed on the teeth of children insured by Medicaid while under general anesthesia, which allegedly gave the false or misleading impression that the plaintiff was singlehandedly responsible for more than one fifth of such placements. (Emphasis added.)

Both articles were accompanied by a photograph that depicts unidentified, gloved hands performing a dental procedure on an unidentified patient. The photograph shows a bent metal tube or implement entering the patient's mouth between the bottom teeth and gumline. It also shows four thin, flatheaded, metal pins, approximately two to three finger widths in length, that the dentist appears to be inserting in front of or between the

---

[2] The parties dispute to what extent Ormseth represented that the interview and the ensuing stories were to encompass the dental commission's proceedings regarding the plaintiff in addition to the Smile by Design allegations.

patient's bottom teeth. The caption to the photograph in the first article provides: "A Terryville dentist, Ammar Idlibi, is being investigated by the state Department of Public Health for doing unnecessary and medically unsound work on children." The photograph credit provides: "(Travis Heying / Associated Press)." The caption to the photograph in the second article, which contains no photograph credit, provides: "State Probes Terryville Dentist for Excessive Work on Children's Teeth." The reference to the Associated Press in the photograph credit of the first story is the only suggestion in either article that the photograph is a stock image and not a photograph of the plaintiff or the procedure at issue in the dental commission proceedings.

The plaintiff, proceeding as a self-represented party, commenced this action by way of a four count complaint, alleging defamation by libel, misrepresentation, negligent infliction of emotional distress, and gross negligence. In the defamation count, which is the only one at issue in the present appeal, the plaintiff alleged that the five previously discussed statements were false and/or misleading and that the defendant published them in bad faith, with improper motive, and with actual knowledge of their falsity.

The only references in the complaint to the photograph are in paragraphs 7 and 12 of the "general allegations," prior to count 1. Paragraph 7 alleges in relevant part: "Under the publication headline, the defendant published a picture of a child who appears to be undergoing an invasive surgical procedure with long screwlike dental implants. The graphic picture was . . . intended to incite public anger against the plaintiff. Under that graphic picture, the defendant identified the plaintiff by name . . . ." Paragraph 12 alleges: "In its second publication, the defendant published the same graphic picture of the child undergoing the invasive surgical procedure with long screw-like dental implants."

In its answer to paragraph 7, the defendant denied that the article was defamatory or that it contained any false statements or representations. With respect to the photograph, the defendant admitted that the article was accompanied by a photograph but "denie[d] that the photograph accompanying the article was 'intended to incite public anger against the plaintiff.' " With respect to paragraph 12, the defendant "admit[ted] that it published a photograph, which speaks for itself, accompanying the [second] article" and otherwise left the plaintiff to his proof. The defendant's first special defense asserted that it had "relied on and accurately characterized public information in writing the articles . . . and, therefore, the claims are barred by the fair report doctrine." The defendant then moved for summary judgment, contending that all four counts of the complaint alleged that the defendant made five libelous statements in the two articles and that all of the alleged statements were based directly on reports by state agencies or state officials and are thus constitutionally protected speech.

The plaintiff submitted an affidavit in opposition to the defendant's motion for summary judgment and later, with the court's permission, a supplemental affidavit. Neither affidavit mentioned the photograph. As an attachment to the supplemental affidavit, the plaintiff submitted an email chain between Ormseth and Rick Green, the defendant's content director. One email from Ormseth, bearing the subject line "RE: what i cut," provides: "I put in a file photo of generic dental work . . . ." This is the only evidentiary reference to the fact that the photograph does not depict the plaintiff or the procedure at issue in the articles.

The plaintiff did make several references to the photograph in his legal arguments to the court. In each instance, though, the argument was framed in terms of how the photograph exemplified the defendant's alleged "malice" and nefarious intent, not as an independent legal

defamation claim. During the hearing on the motion for summary judgment, the plaintiff argued as follows, in his capacity as a self-represented party: "Nobody [has] addressed the graphic picture that you've seen, Your Honor . . . with all those long, big screws sticking out of the child's mouth. Nobody [has] addressed that. Counsel didn't mention anything about that. Why would somebody publish such a big, graphic picture of this child with . . . screws [sticking] out of his mouth? What's the point? That's not even related to a crown. Those are not crowns. . . . I'm a board-certified pediatric dentist. We don't even do this on children, with these kind[s] of implements sticking out of the mouth of a child . . . . I've never done this before. It's unheard of. I don't know where [the defendant] got this picture from, but this was obviously, intentionally made with ill intention and bad faith."

The plaintiff also raised the issue of the photograph in his surreply in opposition to summary judgment. On four separate occasions in the surreply, the plaintiff emphasized (at times using all caps or underscoring) that five allegedly defamatory statements—the same five we previously enumerated—were at issue in the case. He then methodically discussed the five statements, each in a separately titled section of his surreply. His only references to the photograph, which he characterized as "unrelated," were in a later section of the surreply, in which he argued that the defendant's actions were taken with "actual malice."

The trial court found in favor of the defendant and granted its motion for summary judgment on all of the plaintiff's claims. With respect to the defamation claims, the trial court concluded that the five allegedly defamatory statements were protected first amendment speech under either the fair report privilege or the substantial truth doctrine. The court's memorandum of decision made no mention of the photograph.

The plaintiff subsequently filed a motion for articulation. He sought articulation of seven aspects of the trial court's memorandum of decision. The motion did not ask the trial court to address—indeed, it did not even mention—the photograph.

The plaintiff did reference the photograph in a subsequent motion to reargue, in which he referred to it as "misleading," "false," and "unrelated"; in a motion for further articulation, in which he referred to the photograph as "irrelevant" and "unrelated"; and in a related motion for review. In the motion to reargue, he contended that the photograph "amplifie[d] the defamatory effect" of the article's headline. The motion for further articulation referenced his "claims of malice unrelated to the truthfulness of the published defamatory statements (such as the graphic pictures published to incite public anger against the plaintiff) . . . ." In the motion for review, the plaintiff again referenced his "claims of actual malice in publishing unrelated graphic pictures" and claims of "malicious acts not related to [the] reporting [of] any proceeding," such as "publishing an unrelated graphic picture . . . ."

The plaintiff appealed to the Appellate Court, contesting, among other things, the trial court's determination that the fair report privilege provided grounds for rendering judgment for the defendant on his defamation claims. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 860. The plaintiff also contended that the photograph itself constituted an abuse of the fair report privilege because it was misleading and unrelated to the proceedings. Id., 862 n.11. Affirming the judgment, the Appellate Court declined to consider the photograph claim, stating that it had not been distinctly raised before or decided by the trial court. Id., 862 n.11, 869.

We granted certification to appeal, limited to the following two questions: (1) "Did the Appellate Court cor-

rectly determine that it was not required on appeal to consider the self-represented plaintiff's argument that the trial court should have denied the defendant's motion for summary judgment, in whole or in part, because the allegedly defamatory newspaper articles at issue included a misleading image depicting a dental procedure unrelated to the administrative proceeding against the plaintiff that was the subject of the articles?" And (2) "[i]f the answer to the first question is 'yes,' did the Appellate Court properly uphold the trial court's decision granting summary judgment for the defendant with respect to the plaintiff's defamation claims?"[3]

---

[3] The parties' briefing before this court primarily addresses the first certified question and has given us no cause to gainsay the Appellate Court's resolution of the plaintiff's other defamation claims. Accordingly, we confine our discussion to the issue of the photograph, which that court considered only fleetingly in a footnote. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 862 n.11; see, e.g., *State* v. *Butler*, 348 Conn. 51, 55, 300 A.3d 1145 (2023) (declining to address second certified question). In the interest of completeness, however, we briefly explain why the plaintiff's two main arguments as to the second certified question are unpersuasive.

The plaintiff's primary argument as to the second certified question is that three cases from other jurisdictions, the most recent one published almost four decades ago, take the view—contrary to the decision of the Appellate Court—that a headline can be facially defamatory, regardless of the content of the accompanying article, because the public frequently reads only the headline. Those cases are readily distinguishable, however, and the most recent one acknowledges that the majority rule is that a newspaper headline must be construed in connection with the associated article for purposes of assessing defamation. See *Burgess* v. *Reformer Publishing Corp.*, 146 Vt. 612, 620, 508 A.2d 1359 (1986). We do not foreclose the possibility that, in an extreme case, such as a headline accusing an innocent person of having committed a crime, the headline alone might be libelous, even if the truth were clarified in the accompanying article. But this is not such a case. The plaintiff does not contend that he was innocent of the charged conduct, only that the headline could have given readers the misleading impression that he mistreated more than one child. And, in fact, an initial version of the article alleged that the plaintiff owned another dental practice that had engaged in similar misconduct with respect to a second child.

The plaintiff's other principal argument with respect to the second certified question is that the Appellate Court considered the various defamatory statements in isolation, rather than in context and as a whole. Setting aside the tension between this argument and the prior one, we agree with the Appellate Court that the articles, read in their entirety, fairly summarized

*Idlibi* v. *Hartford Courant Co.*, 346 Conn. 908, 908–909, 288 A.3d 1031 (2023). Additional facts will be set forth as necessary.

## II

Had the plaintiff been represented by counsel, there would be little doubt that the Appellate Court properly declined to review the claim that the photograph was independently defamatory.[4] To merit consideration, "an issue must be distinctly raised before the trial court, not just briefly suggested . . . . The requirement that [a] claim be raised distinctly . . . means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked."[5] (Citations omitted; emphasis in original; internal quotation marks omitted.) *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 815–16, 219 A.3d 767 (2019). See

the charges and proceedings before the dental commission. See *Idlibi* v. *Hartford Courant Co.*, supra, 216 Conn. App. 861–66. Even taken together, the handful of alleged misrepresentations—saying "medical" instead of "dental," referring to a two year "investigation" rather than a two year "proceeding," saying "children's" rather than "child's"—at best only slightly exaggerated the core truth of the report, which is that the plaintiff twice has been subjected to discipline for his professional misconduct. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, 193 Conn. 313, 322, 477 A.2d 1005 (1984) ("[when] the main charge, or gist, of the [article] is true, minor errors that do not change a reader's perception of the statement do not make the statement actionable" (internal quotation marks omitted)).

[4] We proceed on the assumption that the gravamen of the plaintiff's argument on appeal is that his complaint "functionally raised" the claim that the photograph was independently defamatory and that it was not protected by the fair report privilege because it was unrelated to the proceedings before the dental commission. At times, however, he seems to be making a different argument, namely, that the photograph was evidence of the defendant's malicious intent toward him and that such malicious intent vitiates the fair report privilege as to the five allegedly defamatory statements contained in the articles. To the extent that the plaintiff also makes this claim, which appears to have been his argument before the trial court, we address it in part II C of this opinion.

[5] Although the plaintiff is correct that, at the summary judgment stage, the defendant bears the burden of establishing that summary judgment is appropriate as to every pleaded claim, the defendant, like the trial court, need only address those claims that have been distinctly raised.

generally *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–31, 99 A.3d 1079 (2014).

In this case, the complaint never alleges that the photograph is independently defamatory. Nor do the plaintiff's affidavits so allege. Indeed, although the plaintiff refers in his briefing to his allegation that the defendant "published a defamatory, misleading cover image," the record does not reveal a single occasion on which he identified the photograph as defamatory before the trial court.

At the time the trial court issued its memorandum of decision, the only possible suggestion that the photograph did not depict the plaintiff and that it might mislead readers as to the nature of the procedure was his statement to the court during the hearing on the motion for summary judgment. But that statement did not identify the photograph as defamatory, and, in any event, the arguments of counsel or a self-represented party do not constitute admissible evidence for purposes of summary judgment. See, e.g., *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 632; *Rockwell* v. *Quintner*, 96 Conn. App. 221, 233–34 n.10, 899 A.2d 738, cert. denied, 280 Conn. 917, 908 A.2d 538 (2006); *Ferri* v. *Powell-Ferri*, Docket No. X03-HHD-CV-16-6066432-S, 2018 WL 4441150, *8 n.8 (Conn. Super. August 23, 2018), aff'd, 200 Conn. App. 63, 239 A.3d 1216, cert. denied, 335 Conn. 970, 240 A.3d 285 (2020); see also *Doe* v. *West Hartford*, 328 Conn. 172, 190 n.12, 177 A.3d 1128 (2018) ("[i]t is well established under our law that the evidence submitted in . . . opposition to . . . summary judgment must be admissible evidence"); *Berman* v. *Berman*, 203 Conn. App. 300, 306–309, 248 A.3d 49 (2021) (holding that trial court erred in considering as evidence statements made by self-represented defendant when she was acting as counsel during hearing).

Similarly, in his subsequent briefing to the trial court, the plaintiff contended only that the photograph ampli-

fied his other defamation claims and was evidence of "actual malice," not that it was independently defamatory. And those arguments, too, included no admissible evidence, other than the one line email that the plaintiff never addressed, which vaguely references a generic file photograph. Had the plaintiff been represented by counsel, none of that would have warranted a denial of summary judgment with respect to an independent defamation claim as to the photograph. See *White* v. *Mazda Motor of America, Inc.*, supra, 313 Conn. 619–31. The issue before us, then, comes down to the degree of leeway we afford to self-represented parties who fail to comply with established pleading requirements.

## A

The following well established principles guide our review.[6] Although a party "has every right" to act as his own advocate; *Cersosimo* v. *Cersosimo*, 188 Conn. 385, 394, 449 A.2d 1026 (1982); when he elects to do so, "he takes the risk that because of his inexperience and lack of knowledge, he will suffer disadvantages to which, with proper representation, he would not be subject." *State* v. *Lo Sacco*, 12 Conn. App. 481, 496, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987). In determining the lengths to which our courts may and should go to mitigate those disadvantages, we have sought to strike a balance.

On the one hand, we have emphasized that "it is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and . . . to construe the rules of practice liberally in [their] favor . . . . The courts adhere to this rule to ensure that [self-represented] litigants receive a full and fair opportunity to be heard, regardless of their lack of legal edu-

---

[6] See *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 408–11, 223 A.3d 37 (2020) (setting forth standard of review on summary judgment and background free speech principles).

cation and experience . . . ." (Internal quotation marks omitted.) *Traylor* v. *State*, 332 Conn. 789, 806, 213 A.3d 467 (2019).

On the other hand, we have cautioned that, "[a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) Id.; see also *Basilicato* v. *Dept. of Public Utility Control*, 197 Conn. 320, 324, 497 A.2d 48 (1985) ("[a]ny litigant may choose to proceed without representation, but all are bound by the same standards"); *Berman* v. *Berman*, supra, 203 Conn. App. 312 ("[s]elf-represented parties are not afforded a lesser standard of compliance" (internal quotation marks omitted)); *Patrowicz* v. *Peloquin*, 190 Conn. App. 124, 136 n.13, 209 A.3d 1233 (self-represented parties "are bound by the same rules of evidence and procedure as those qualified to practice law" (internal quotation marks omitted)), cert. denied, 333 Conn. 915, 216 A.3d 651 (2019). For example, a self-represented litigant is not "relieved of the obligation to sufficiently articulate a claim so that it is recognizable to a reviewing court . . . ." (Internal quotation marks omitted.) *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 804, 256 A.3d 655 (2021); see also *Traylor* v. *State*, supra, 332 Conn. 806 ("[a] court does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised" (internal quotation marks omitted)).

In particular, special allowances should not be made for a self-represented party when to do so would (1) interfere with the rights of other parties; see, e.g., *Traylor* v. *State*, supra, 332 Conn. 806; (2) violate the rules of evidence or procedure; see, e.g., *Cersosimo* v. *Cersosimo*, supra, 188 Conn. 394; or (3) undermine the perceived neutrality of the judicial officer and place the

court in the role of advocate. See, e.g., *Pliler* v. *Ford*, 542 U.S. 225, 231, 124 S. Ct. 2441, 159 L. Ed. 2d 338 (2004).

B

We must determine on which side of the scale the present case falls. For the following four reasons, we conclude that, regardless of whether the Appellate Court properly declined to review the claim, the trial court did not err in granting the defendant's motion for summary judgment without treating the plaintiff's passing references to the photograph as an independent allegation of defamation.

First, we conclude that this case is more akin to those in which we have held a claim of a self-represented party not to be distinctly raised. In cases involving ill-defined pleadings by self-represented parties, our courts have construed those pleadings broadly and deemed the claims to be sufficiently pleaded when they were specific enough to reasonably alert the trial court and the defendant as to the nature of the claim. See, e.g., *Henderson* v. *Commissioner of Correction*, 181 Conn. App. 778, 793–94, 189 A.3d 135 (although application for fee waiver was not "a model of clarity" and reviewability of grounds for appeal identified therein was "debatable," court concluded that accompanying motion sufficiently alerted court as to nature of claims at issue), cert. denied, 329 Conn. 911, 186 A.3d 707 (2018); *Hill* v. *Williams*, 74 Conn. App. 654, 658–62, 813 A.2d 130 (although claims were not "artfully pleaded," preamble to complaint expressly identified breach of contract claim), cert. denied, 263 Conn. 918, 822 A.2d 242, and cert. denied, 263 Conn. 918, 822 A.2d 242 (2003).

By contrast, we have concluded that claims were not preserved when the complaint made only a vague or passing reference thereto. See, e.g., *Oliphant* v. *Commissioner of Correction*, 274 Conn. 563, 570–71, 877

A.2d 761 (2005) (declining to construe self-represented party's "indirect and passing reference" as distinct pleading, "even under a broad and liberal reading," because "courts . . . cannot contort pleadings in such a way so as to strain the bounds of rational comprehension" (internal quotation marks omitted)); *New Haven* v. *Bonner*, 272 Conn. 489, 497–99, 863 A.2d 680 (2005) (brief references to underlying facts during hearings were insufficient to preserve claim when self-represented defendant never identified it as potential due process violation); *Mourning* v. *Commissioner of Correction*, 120 Conn. App. 612, 623, 992 A.2d 1169 ("passing reference" was insufficient to raise claim, even under liberal reading of complaint), cert. denied, 297 Conn. 919, 996 A.2d 1192 (2010); see also *Basilicato* v. *Dept. of Public Utility Control*, supra, 197 Conn. 324–26 (clerk was not required to inform self-represented plaintiff that notice was improperly filed); *Overley* v. *Overley*, 209 Conn. App. 504, 512, 268 A.3d 691 (2021) ("[w]e will not promote a Kafkaesque academic test by which [a trial court] may be determined on appeal to have failed because of questions never asked of [it] or issues never clearly presented to [it]" (internal quotation marks omitted)), cert. denied, 343 Conn. 901, 272 A.3d 657 (2022).

"[A]t some point in a lawsuit even [self-represented] litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief. The summary judgment stage is an appropriate juncture to identify the real issues in a case." *Salahuddin* v. *Coughlin*, 781 F.2d 24, 29 (2d Cir. 1986). As we explained in *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 23 A.3d 668 (2011), "[t]he principle that a plaintiff may rely only [on] what he has alleged is basic. . . . In order to administer justice fairly, this court cannot allow [self-represented] litigants . . . to try on new claims throughout the appellate process in the hope

of finding one that fits." (Citations omitted; internal quotation marks omitted.) Id., 75.

The present case falls on the latter side of this divide. We have explained that "[e]ach [defamatory] statement furnishes a separate cause of action and requires proof of each of the elements for defamation." *Gleason* v. *Smolinski*, 319 Conn. 394, 431, 125 A.3d 920 (2015). Those elements are a (1) false (2) communication (3) that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.[7] Id. There is no serious question that the photograph was a communication, and the allegation in the complaint that "[t]he graphic picture was . . . intended to incite public anger against the plaintiff" plausibly could be construed to allege the third element of reputational harm. There is no suggestion in the complaint or the plaintiff's affidavits, however, that the photograph was intended to or did present a false depiction of the plaintiff's own dental procedures. Nor is there any suggestion that the plaintiff intended his fleeting references to the photograph to constitute a distinct claim of defamation. We emphasize in this respect that the plaintiff expressly alleged in his complaint that each of the defendant's five allegedly defamatory statements was false, unfair, or inaccurate, and he itemized each alleged defamation in his briefing to the trial court, but he made no mention of the truth, falsehood, or accuracy of the photograph; nor did he ever list it among his discrete defamation claims.[8]

---

[7] We need not and therefore do not determine whether the plaintiff also was required to establish actual malice; see *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); *Gleason* v. *Smolinski*, supra, 319 Conn. 432–33 and n.32; and, if so, what knowledge the defendant would need to have had regarding the photograph (e.g., that it was a stock image, that a substantial share of readers would have been confused, etc.) for there to be actual malice.

[8] The plaintiff's only contention in the complaint was that the photograph was calculated to incite anger against him. Certainly, anger against the plaintiff might be incited by a misleading photograph that portrayed a differ-

The sole indication that the plaintiff considered the photograph to be a false depiction of his work came in his arguments to the court, as a self-represented party. But the plaintiff has not identified (and our own research has not revealed) any case in which a Connecticut court has made an exception to the rule that only admissible evidence may be considered in support of or opposition to a motion for summary judgment. Even if we were to construe the complaint in light of the arguments before the trial court, we note that the plaintiff brought up the photograph only in the context of "going back . . . to the malice issue," and his conclusion was that the photograph "was obviously, intentionally made with ill intention and bad faith." The plaintiff also never alleged that the procedure depicted in the photograph was more graphic or disturbing, or reflected worse on his reputation, than what actually occurs when eight crowns are unnecessarily placed on the teeth of a three year old child. Once again, then, any suggestion that the photograph represented an independent defamatory statement was at best a vague and passing reference of the sort that we have deemed insufficient to distinctly raise a claim, even by a self-represented party.

Second, both this court and the Appellate Court routinely decline to consider the claims and to address the arguments of self-represented parties when, due to the absence of professional counsel, those claims and arguments are not presented with sufficient clarity to facilitate a full review. See, e.g., *Burton* v. *Dept. of Environmental Protection*, supra, 337 Conn. 803–805; *Traylor* v. *State*, supra, 332 Conn. 807; *Wells Fargo Bank, National*

---

ent dentist than him and a different procedure than the one at issue in the hearing. But an equally plausible interpretation of that allegation—and the one on which both the defendant and the trial court appear to have proceeded—is that, in paragraphs 7 and 12 of the complaint, the plaintiff merely was trying to establish the defendant's malice by demonstrating that the defendant had selected an especially disturbing depiction, either of his work or of dental work in general.

*Assn.* v. *Doreus*, 218 Conn. App. 77, 79 n.1, 290 A.3d 921, cert. denied, 347 Conn. 904, 297 A.3d 198 (2023); *Randolph* v. *Mambrino*, 216 Conn. App. 126, 152–53, 284 A.3d 645 (2022); *C. B.* v. *S. B.*, 211 Conn. App. 628, 629–31, 273 A.3d 271 (2022). We would be loathe to hold the trial court to a higher standard than we hold ourselves to or to demand greater solicitousness to self-represented litigants than we ourselves are prepared to indulge.

Although, from one perspective, it might have been supererogatory—morally praiseworthy, above and beyond the call of duty—for the trial court to canvass the self-represented plaintiff, help him ferret out and articulate any potentially cognizable claims hidden in his complaint, and then to invite him to properly replead them, we are not prepared to say that such assistance was legally required. As the United States Supreme Court has explained on more than one occassion, "the trial [court] is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the [self-represented party] that counsel would normally carry out." (Internal quotation marks omitted.) *Martinez* v. *Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 162, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000); see also *Pliler* v. *Ford*, supra, 542 U.S. 231 (trial courts "have no obligation to act as counsel or paralegal to [self-represented] litigants"). Indeed, "[r]equiring [trial] courts to advise a [self-represented] litigant in such a manner would undermine [the trial courts'] role as impartial [decision makers]." *Pliler* v. *Ford*, supra, 231; see also part II D of this opinion.

Third, for the trial court to reach out and help the plaintiff to articulate and plead an additional claim that was not apparent on the face of the complaint, and of which the defendant was unaware, not only would have risked creating an appearance of partiality but also would have interfered with the defendant's own rights.

Facing rising cost pressures, publishers rely heavily on stock images to illustrate their stories. See, e.g., J. Hecker, Comment, "Contracting and the Rights of Photographers," 53 Case W. Res. L. Rev. 659, 661 (2003); B. Seecof, Comment, "Scanning into the Future of Copyrightable Images: Computer-Based Image Processing Poses a Present Threat," 5 High Tech. L.J. 371, 390 (1990). Imposing liability on a newspaper because readers could possibly misconstrue a stock image as depicting the people discussed in the accompanying article would be unprecedented,[9] and would risk seriously chilling core first amendment expression on matters of public concern.[10]

The defendant, as a news organization, has a powerful interest in not having to defend frivolous defamation claims when it publishes on matters of public concern,

[9] Almost all of the published defamation cases involving stock images run in the other direction. The defendant newspaper uses a stock image, allegedly without the consent of the subject of that image, to illustrate a story of illegality or iniquity, and the subjects of the image, who are wholly innocent, contend that they were defamed when readers assumed that they were the ones who engaged in the depraved conduct. See *Southeastern Newspapers, Inc.* v. *Walker*, 76 Ga. App. 57, 59, 44 S.E.2d 697 (1947) (discussing "the usual line of cases [in which] the portrait of the person alleged to have been [libeled] is accompanied by an article [that] is either libelous per se or per quod"); see also, e.g., *Peck* v. *Tribune Co.*, 214 U.S. 185, 188, 29 S. Ct. 554, 53 L. Ed. 960 (1909) (portrait of plaintiff used to illustrate story about nurse who recommended whisky as medicinal tonic); *Stanton* v. *Metro Corp.*, 438 F.3d 119, 122–23 (1st Cir. 2006) (photograph of plaintiff used to illustrate story about teenage sexual promiscuity); *Prystash* v. *Best Medium Publishing Co.*, 157 Conn. 507, 508–10, 254 A.2d 872 (1969) (photograph of plaintiff used to illustrate story about another woman who committed felony). In this case, by contrast, the plaintiff was the one who was involved in the illegal and unethical conduct reported in the articles. His claim is merely that the stock photograph, if misunderstood, might have made his misconduct appear even more opprobrious than it actually was.

[10] The high court of the state of New York, home to the world's publishing capital, has repeatedly warned, albeit in a distinct, statutory context, of the constitutional risks of imposing liability when a newspaper's use of a stock photograph in conjunction with an article on matters of public interest risks creating a false impression in the minds of readers. See generally *Messenger ex rel. Messenger* v. *Gruner + Jahr Printing & Publishing*, 94 N.Y.2d 436, 442–43, 727 N.E.2d 549, 706 N.Y.S.2d 52 (2000).

such as children's health and Medicaid fraud. See *Smith* v. *Supple*, 346 Conn. 928, 943–44, 293 A.3d 851 (2023); see also General Statutes § 52-196a (anti-SLAPP statute); *Tomkiewicz* v. *Detroit News, Inc.*, 246 Mich. App. 662, 666, 635 N.W.2d 36 (2001) ("[W]e must consider society's interest in free expression, in addition to the interests of the individual parties. . . . [S]ummary disposition is an essential tool in the protection of [f]irst [a]mendment rights." (Internal quotation marks omitted.)). It would make little sense to encourage or require the trial court to affirmatively assist the plaintiff in articulating and pleading an ill formed defamation claim that may intrude into constitutionally protected territory and that could expose the defendant to costly litigation for exercising its free speech rights, contrary to the established policy of our state.[11]

Fourth, had this case been allowed to proceed, for the plaintiff to have prevailed on the photograph claim would have been a Herculean task. He would have to establish that the photograph made an implicit truth claim—that this was a photograph of the plaintiff performing a procedure on a child—such that it was a possible means of defamation.[12] See, e.g., *NetScout Systems, Inc.* v. *Gartner, Inc.*, 334 Conn. 396, 413–14, 223 A.3d 37 (2020) (statement in question must be susceptible of being proved true or false, or subject to objective verification); see also *Powell* v. *Jones-Soderman*, 849 Fed. Appx. 274, 277 (2d Cir. 2021) ("in a suit by a private plaintiff involving a matter of public concern . . . allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity" (internal quotation marks omitted)). The plaintiff would have to establish that "an important and

---

[11] To be clear, we do not foreclose the possibility that a publication's use of a stock image might be so misleading and defamatory as to take it outside the protections of the first amendment. That is a question for another day.

[12] Of course, he would also have to establish the falsity of those claims and, potentially, actual malice, as well.

respectable" subset of readers would not have understood that the photograph might be a stock image, even though stock photographs are widely used in newspapers, and the defendant's first article attributed the one at issue to the Associated Press. *Peck* v. *Tribune Co.*, 214 U.S. 185, 190, 29 S. Ct. 554, 53 L. Ed. 960 (1909); see also 3 Restatement (Second), Torts § 559, comment (e), p. 157 (1977) (communication must tend to prejudice plaintiff "in the eyes of a substantial and respectable minority" of his associates). He would have to establish that the procedure depicted in the photograph is significantly more disturbing than run-of-the-mill dental procedures ranging from fillings to root canals, all of which involve sticking foreign metal implements into the mouths of patients under bright lighting, often accompanied by pain and blood. See, e.g., *Strada* v. *Connecticut Newspapers, Inc.*, 193 Conn. 313, 322, 477 A.2d 1005 (1984) ("[t]he issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced" (internal quotation marks omitted)).

Finally, and perhaps most significant, to establish more than nominal damages, the plaintiff would have to prove that it was the stock photograph, rather than the information contained in the articles—that he had been twice disciplined, and placed on probation, for various professional misconduct—that led his patients to leave his practice. This would be particularly difficult to establish because it is counter to the plaintiff's own sworn statements. In his February 12, 2021 affidavit, for example, the plaintiff stated: "I lost around 70 [percent] of my established [patient] pool. When my staff attempted to confirm my patients' appointments, many of their parents indicated that they would not bring their children to a dentist who abuses drugs." Further, the plaintiff represented in his complaint that a substantial portion of his income is derived from referrals from

general dentists in the community, and he implied that a drop-off in those referrals, as well as negative television news coverage of his misconduct (factors that have little, if anything, to do with the photograph), was the cause of his lost income. For these reasons, we are unable to find fault with the trial court for not denying the defendant's motion for summary judgment as to a claim that the plaintiff never pleaded and that is undercut by his own sworn representations.

C

We next consider what appears to have been the plaintiff's primary claim (as to the photograph) before the trial court and what is, perhaps, an alternative claim on appeal. Relying on the decision of the Appellate Court in *Burton* v. *American Lawyer Media, Inc.*, 83 Conn. App. 134, 847 A.2d 1115, cert. denied, 270 Conn. 914, 853 A.2d 526 (2004), the plaintiff appears to have proceeded on the theory that the fair report privilege will be defeated if the defendant acted with what the plaintiff calls "actual malice," by which he appears to mean malice in fact.[13] In other words, his main purpose in referencing the photograph in his briefing to the trial court was to immunize his five defamation claims

---

[13] It is unclear to what extent the plaintiff's frequent references to "actual malice" and purported evidence that the defendant exhibited actual malice toward him reflect a misunderstanding of the meaning and legal import of that term in first amendment jurisprudence. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) ("[t]he constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory *falsehood* relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not" (emphasis added)); see also *Gleason* v. *Smolinski*, supra, 319 Conn. 432–33 n.32, 447, 452 (corrupt motive and intent to inflict harm do not establish actual malice under *Sullivan*). As we discuss in this part of the opinion, if a statement is true, or if it is protected by the fair report privilege, then it is protected speech, and neither the defendant's attitude toward its truth (the *actual malice* question) nor the defendant's attitude toward the plaintiff (the *malice in fact* question) is legally relevant.

against the defendant's fair report defense, rather than to set out a distinct, sixth claim.

The plaintiff's reliance on *American Lawyer Media, Inc.*, while understandable, is misplaced. It is true that, in *American Lawyer Media, Inc.*, the Appellate Court stated that fair reporting is a conditional privilege that will be defeated by malicious intent. Id., 138. The statement was dictum in that case, however, as there was no evidence of malice. See id. Moreover, the case that *American Lawyer Media, Inc.* cited for the proposition, *Bleich* v. *Ortiz*, 196 Conn. 498, 504, 493 A.2d 236 (1985), spoke generally of conditional privileges but did not say that fair reporting is a conditional privilege; indeed, there is no mention of the fair report privilege in that opinion.

In any event, *American Lawyer Media, Inc.* does not reflect an accurate statement of Connecticut law. Rather, we adhere to the modern view that, for the fair report privilege to attach, a defendant need only establish that it has provided a fair and substantially accurate account of the proceedings. See, e.g., *Elder* v. *21st Century Media Newspaper, LLC*, 204 Conn. App. 414, 428, 254 A.3d 344 (2021) (clarifying *American Lawyer Media, Inc.*, and explaining that malice does not defeat fair report privilege); *Salzano* v. *North Jersey Media Group, Inc.*, 201 N.J. 500, 530, 993 A.2d 778 (2010) ("[u]nder [the] modern trend of the law, the accurate reporting of [official] proceedings results in complete immunity, regardless of the knowledge or motive of the publisher" (internal quotation marks omitted)), cert. denied, 562 U.S. 1200, 131 S. Ct. 1045, 178 L. Ed. 2d 864 (2011); 3 Restatement (Second), supra, § 611, comment (a), pp. 297–98 (fair report privilege is broader in scope than conditional privilege and is abused only when publisher does not give fair and accurate report of proceeding). Demonstrating actual malice might have been *necessary* for the plaintiff's defamation claims to pro-

ceed; see footnote 7 of this opinion; but neither actual malice nor malice in fact is *sufficient.*

Of course, if the photograph is unrelated to the proceedings before the dental commission, as appears to be undisputed, then the fair report privilege does not apply to it. In that case, the defendant would not be protected from claims of defamation *as to the photograph*, regardless of motive. But the defamation still must be alleged. It was not.

D

Finally, we address the thoughtful and thorough dissenting opinion. It is unclear to us to what extent the dissent disagrees as to the degree to which a trial court reasonably can and should be solicitous of self-represented litigants, and to what extent we simply read differently the record in this case. We will briefly address both points.

We recognize, of course, the increasing prevalence of self-represented parties in our courtrooms, and we both appreciate and share the dissent's deep commitment to providing meaningful access to justice for those litigants. No one could quibble with the body of authorities the dissent has marshaled to that end.

At the same time, we do not understand the dissent to disagree that helping self-represented litigants in their pursuits is not an absolute obligation; nor does it always outweigh other considerations. Other important values and ends may come into conflict and need to be balanced, from the efficient administration of justice to fairness to opposing parties. Of particular importance to the present matter, we must be careful that judges, in the course of shepherding self-represented litigants through the trial process, do not shed the neutrality, or appearance thereof, that is so central to our judicial

roles. The authorities on this side of the ledger are equally voluminous.

Where to strike the balance? Guidance comes from rule 2.2 of the Code of Judicial Conduct, which requires that judges "perform all duties of judicial office fairly and impartially." The commentary to the rule clarifies that "[i]t is not a violation of this [r]ule for a judge to make *reasonable* accommodations to ensure self-represented litigants the opportunity to have their matters fairly heard." (Emphasis added.) Code of Judicial Conduct Rule 2.2, comment (4). The question, then, is whether it is a *reasonable* accommodation for a judge sua sponte (1) to recognize that a litigant has misunderstood a set of substantive legal principles and that, if the principles were properly understood, the litigant might be able to articulate an additional, relatively novel claim, (2) to take on the task of educating the litigant in the nuances of the law, and then (3) to invite the litigant to replead and allege that novel claim. None of the cases cited by the dissent comes close to suggesting that this would be appropriate—let alone required—conduct for a judge.

Which brings us to the specifics of this particular case, which, we suspect, are the true source of our disagreement with the dissent. By our count, on twenty-two separate occassions, the dissent implies, or outright contends, that the trial court did not "allow" or "permit" the plaintiff to revise his complaint to make a distinct defamation claim related to the photograph. In fact, the plaintiff never filed any motion or made any request to revise or replead. The trial court never denied any such motion or request. And the plaintiff never sought permission to state a claim relating to the photograph. The reality is that the closest the plaintiff ever came to making such a request was one generic sentence in his objection to the defendant's motion for summary judgment, in which he wrote: "The plaintiff respectfully requests the

court to decide the [defendant's] motion [for summary judgment] as a motion to strike if the court finds that any of the plaintiff's pleadings are legally insufficient." There was no futher discussion of or action on that request. The dissent would have us hold that the court should have used that generic request as the hook by which to educate the plaintiff about the law of defamation, to explain the possible existence of a potential additional claim, and to encourage the plaintiff to bring that claim. We can debate whether those would have been reasonable accommodations, but we should be clear that the plaintiff was never denied the right or opportunity to revise his complaint.[14]

This flows from, and encapsulates, a broader disagreement as to the record. The dissent appears to assume that, all along, the plaintiff was trying his best to state a distinct defamation claim relating to the photograph but that he just failed to use the correct "magic words" needed to articulate that claim in a legally cognizable manner. The defendant then somehow tricked him into not clarifying his claim when given the chance to do so, and the trial court, recognizing all of this, unobligingly granted the motion for summary judgment as to the claim rather than extending the self-represented plaintiff the basic courtesy of explaining *why* the court was rejecting the claim, so that he could properly replead it.

Perhaps that's what happened, but it's not how we read the record. The concept that a photograph may

---

[14] The dissent suggests that the plaintiff should have been provided an opportunity to file a substituted complaint in accordance with *American Progressive Life & Health Ins. Co. of New York* v. *Better Benefits, LLC*, 292 Conn. 111, 121–25, 971 A.2d 17 (2009), and *Larobina* v. *McDonald*, 274 Conn. 394, 400–403, 876 A.2d 522 (2005). See part III B 1 of the dissenting opinion. The plaintiff advanced no such contention in this court until filing a motion for reconsideration, and we decline to consider that new argument on reconsideration. Nothing in our determination of the present case should be understood to affect or alter our holdings in those cases.

have a propositional truth value, such that it can make a false, defamatory "statement" about someone, is not an obvious one. As we discussed, the cases that have entertained such a theory are few in number and narrow in scope. Nothing in this record suggests that the plaintiff had any idea that such a claim might be available to him until his case was on appeal. Rather, there is every indication that his occasional references to the photograph evidenced, in his mind, nothing more than a malintent on the part of the defendant. So, it's not that he used the wrong *words* to state the claim, a mere "pleading deficiency" or "technicality," as the dissent puts it. Part V of the dissenting opinion. He had the wrong *ideas*, and so didn't even know that he had a potential claim.

We think that for the trial court to have educated the plaintiff about, and helped him to develop, potential legal theories with which he was unfamiliar would be to take more than one step over the line of impartiality. To then have to litigate those theories, however frivolous, would place a burden on the defendant that it would not have otherwise faced.

Finally, we think that the dissent overlooks a critical distinction when it suggests that there is no difference between, on the one hand, a claim that the subject of a stock photograph has been defamed by the juxtaposition of that photograph with an article discussing illegal or immoral conduct (a legal theory that various cases have recognized) and, on the other hand, a claim that the subject of an article about illegal, immoral conduct has been defamed by juxtaposition with a stock photograph depicting arguably worse, or at least different, bad conduct. The latter would open a Pandora's box that the former does not; any individual discussed in any article accompanied by a stock photograph could allege that readers might confuse them with a subject in the photograph and contend that the comparison is

somehow unflattering and defamatory. This may be why no known judicial decision has ever recognized the theory that the dissent chides the trial court for not helping the plaintiff articulate. And, surely, the fact that the interests involved are subject to special constitutional protections is not without relevance here.

Our ultimate concern, with respect to self-represented litigants, as with all others, is that due process be afforded and justice be done. In close cases—let us assume, for the moment, that this was a close case— we must defer to the discretion of the trial court as to how far it reasonably can go in accommodating self-represented litigants while preserving judicial economy, neutrality, and fairness to opposing parties. When a trial court is invited to provide assistance approaching the outer limits of judicial impartiality, going well beyond accommodations as to merely technical requirements, part of that discretion reasonably may involve an assesment of whether the case is one that should be encouraged to proceed. We have no doubt that there are cases in which our trial courts could do more to ensure that a party's inability to obtain professional representation does not work an injustice. This is not such a case.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and MULLINS, DAN-NEHY and WESTBROOK, Js., concurred.